_____

|  |  |  |
|---|---|---|
| **MANDI L. STANLEY,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 11-10027-DJC** |
| | ) | |
| **CAROLYN W. COLVIN,[1]** | ) | |
| **Commissioner,** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____)

**<u>MEMORANDUM AND ORDER</u>**

**CASPER, J.**                                                    **March 28, 2014**

## I.      Introduction

Plaintiff Mandi L. Stanley ("Stanley") filed a claim for supplemental security income

("SSI") with the Social Security Administration.  Pursuant to the procedures set forth in the

Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Stanley brought this action for judicial

review of the final decision of the Commissioner of the Social Security Administration ("the

Commissioner"), issued by an Administrative Law Judge ("ALJ") on January 29, 2010, denying

her claim.  Before the Court are Stanley's motion to reverse and the Commissioner's motion to

affirm that decision.  In her motion, Stanley claims that the ALJ erred in denying her claim

because the ALJ:  (1) failed, without explanation, to afford adequate weight to the opinion of her

_____

[1] During the pendency of this litigation, Ms. Colvin became the Acting Commissioner of the Social Security Administration.  The Court, therefore, substitutes Ms. Colvin as the defendant in this matter.  Fed. R. Civ. P. 25(d).

treating psychiatrist; (2) determined that her impairments did not meet or equal the requirements of listing 12.05(c) under 20 C.F.R. Part 404, Subpart P, Appendix 1; (3) improperly assessed her credibility; and (4) improperly assessed her residual functional capacity ("RFC") in light of substantial evidence. For the reasons explained below, the Court GRANTS the Commissioner's motion to affirm and DENIES Stanley's motion to reverse.

## II.    Factual Background

Stanley was born on July 16, 1982 and was twenty-one years old when she applied for SSI benefits on September 16, 2003, alleging disability beginning on June 1, 2001. R. 48-52.[2] In the Disability Report filed with the SSA, Stanley alleged that a learning disability, depression and anxiety limited her ability to work. R. 53-58.

## III.   Procedural Background

Stanley filed claims for SSI benefits on September 16, 2003. R. 48-52. After initial review, the SSA denied her claims on January 16, 2004. R. 32-34. Upon reconsideration, the claims were again denied on October 13, 2004. R. 36-37. In December 2004, Stanley filed a timely request for a hearing before an ALJ pursuant to SSA regulations. R. 38. A hearing was held before the ALJ on January 18, 2006. R. 274-313. In a written decision, dated June 27, 2006, the ALJ found that Stanley was not disabled within the definitions of the Social Security Act and denied her claims. R. 14-29. On May 22, 2007, the Appeals Council denied a request to review Stanley's claim, rendering the ALJ's decision the Commissioner's final decision. R. 6-8.

Having exhausted her administrative remedies, Stanley sought judicial review under 42 U.S.C. § 405(g). A March 22, 2009 order of this Court (Wolf, J.) remanded Stanley's case to the

---

[2] "R." refers to the administrative record. The administrative record was filed manually. <u>See</u> D. 21.

Commissioner for further proceedings because the Commissioner's decision had not considered applicable impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, and had not accounted for and resolved a discrepancy between the testimony of a vocational expert ("VE") and the information contained in the Dictionary of Occupational Titles ("DOT"). R. 350-73. Upon remand, the same ALJ conducted a new hearing on October 8, 2009. R. 539-97. On January 29, 2010, the ALJ issued a decision determining that Stanley was not disabled. 332-49. After consideration of Stanley's request for review, R. 324-26, the Appeals Council declined to review on November 1, 2010, rendering the ALJ's decision the Commissioner's final decision. R. 318-20.

## IV. Discussion

### A. <u>Legal Standards</u>

#### 1. *Entitlement to Disability Benefits and Supplemental Security Income*

A claimant's entitlement to SSI turns in part on whether she has a "disability," defined in the Social Security context as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i), 423(d)(1)(A); 20 C.F.R. § 404.1505. The inability must be severe, rendering the claimant unable to do her previous work or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§404.1505–404.1511.

The Commissioner must follow a five–step process when she determines whether an individual has a disability for Social Security purposes and, thus, whether that individual's application for benefits will be granted. 20 C.F.R. §§ 404.1520, 416.920. The determination of

disability may be concluded at any step along the process.  Id.  First, if the applicant is engaged

in substantial gainful work activity, then the application is denied.  Id.  Second, if the applicant

does not have, or has not had within the relevant time period, a severe medically determinable

impairment or combination of impairments, then the application is denied.  Id.  Third, if the

impairment or combination of impairments meets the conditions for one of the "listed"

impairments in the Social Security regulations, then the claimant is considered disabled and the

application is granted.  Id.  Fourth, if the applicant's "residual functional capacity" ("RFC") is

such that she can still perform past relevant work, then the application is denied.  Id.  Fifth, if the

applicant, given her RFC, education, work experience, and age, is unable to do any other work,

the claimant is considered disabled and the application is granted.  Id.

> 2.    *Standard of Review*

This Court has the power to affirm, modify or reverse a decision of the Commissioner

upon review of the pleadings and record.  42 U.S.C. § 405(g).  Such review, however, is "limited

to determining whether the ALJ used the proper legal standards and found facts upon the proper

quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000) (citing

Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999)).  The ALJ's findings of fact are conclusive

when supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence exists "if a

reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to

support [the Commissioner's] conclusion."  Irlanda Ortiz v. Sec'y of Health & Human Servs.,

955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647

F.2d 218, 222 (1st Cir. 1981)) (internal quotation mark omitted).  The ALJ's findings of fact,

however, "are not conclusive when derived by ignoring evidence, misapplying the law, or

judging matters entrusted to experts." <u>Nguyen</u>, 172 F.3d at 35 (citations omitted).  Thus, if the ALJ made a legal or factual error, <u>Manso-Pizarro v. Sec'y of Health & Human Servs.</u>, 76 F.3d 15, 16 (1st Cir. 1996) (citation omitted), the Court may reverse or remand such decision to consider new material evidence or to apply the correct legal standard.  <u>See</u> 42 U.S.C. § 405(g).

**B.**     **Before the ALJ**

      *1.*     *Medical History*

         a.   <u>Treatment Records</u>

On January 24, 2000, Stanley was referred to Tri-City Mental Health and Retardation Center, Inc. ("Tri-City") for treatment of depression.  R. 90.  She was seventeen years old at the time.  <u>Id.</u>  During intake, Stanley reported that she "always felt sad" and that she had experienced excessive anxiety and worsening depressive symptoms in recent months.  R. 90, 92.  At the time, Stanley was in the eleventh grade at Malden High School, where she attended special needs classes for reading and math and had a history of earning grades of Bs and Cs.  R. 96.  A licensed clinical social worker diagnosed Stanley with an adjustment disorder with mixed anxiety and depressed mood and assigned a Global Assessment of Functioning ("GAF") score of 60.[3]  R. 97.

Quarterly progress reports from Tri-City indicate that Stanley was diagnosed with dysthymia through the remainder of the year and was consistently assigned GAF scores of 55-60.  R. 105-112.   Stanley began taking antidepressant medication during that time period.   <u>Id.</u>  Stanley's symptoms, diagnoses and GAF scores remained consistent through November 2001.  R. 113-122.  Progress notes of Dr. Juana Vainer indicate that as Stanley's treatment progressed,

---

[3] The Global Assessment of Functioning scale measures social, occupational, and psychological functioning of adults. A GAF score in the 51-60 range indicates moderate symptoms or moderate difficulty in social, occupational or school functioning.  <u>See</u> Am. Psych. Ass'n, <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 32-34 (4th ed. Text Revision 2000). ("DSM-IV-TR").

her depression and anxiety symptoms and sleep issues appeared to improve, particularly beginning in November 2000. R. 126-133. A September 11, 2001 record indicated that Stanley was doing well, had graduated, was not currently working and was "thinking [about] what she wants to do." R. 133. A November 2001 progress note indicated that Stanley was informed Tri-City would not be able keep her case open because she was planning to leave for California. R. 134.

Stanley began seeing Dr. Talbot of the Psychiatric Group of the North Shore in August 2003. R. 152. During their initial meeting, Stanley complained of family problems and reported that she often withdrew to her bedroom. Id. She reported that nothing could calm her down and that she had low energy levels, difficulty concentrating and difficulty sleeping. Id. Dr. Talbot diagnosed a severe, recurrent major depressive disorder and assigned a GAF score of 50.[4] Id. Stanley's depression and anxiety symptoms, sleeping issues and other symptoms fluctuated during the next four months, with some signs of improvement and some signs of relapse. R. 153-69, 224-32. Dr. Talbot monitored and adjusted Stanley's medication regimen during this period. Id. Dr. Talbot's diagnosis of severe major depressive disorder and assignment of GAF scores of 50 were consistent until October 2003. Id. He diagnosed moderate major depressive disorder in November and December 2003, assigning GAF scores of 55. Id.

On December 30, 2003, Dr. Talbot noted Stanley's belief that going to San Francisco to stay with her "very lonely and depressed" aunt would offer Stanley "something to do" for three months. R. 169. After a meeting on January 9, 2004, Dr. Talbot prescribed a 90-day supply of medication and scheduled an appointment for Stanley's return. R. 170, 223. On April 8, 2004,

---

[4] A GAF score in the 41-50 range indicates serious symptoms or any serious impairment in social, occupational, or school functioning. See DSM-IV-TR.

Stanley saw Dr. Talbot again and reported that she felt "good and better" and not "depressed." R. 171, 222. Dr. Talbot determined that Stanley's major depressive disorder was in partial remission and assigned a GAF score of 60. Id. Dr. Talbot prescribed another 90-day supply of medication because Stanley was planning to stay with cousins in Chicago for three months. Id. During their next meeting on August 9, 2004, Dr. Talbot determined that Stanley's major depressive disorder was in full remission and noted that Stanley believed her medications kept her "leveled." R. 172, 220-21. Dr. Talbot assigned a GAF score of 60. Id. He prescribed another 90-day supply of medication and scheduled a November 2004 appointment. Id.

Stanley saw Dr. Talbot next on October 15, 2004, at which time she reported similar symptoms, but stated that she was distressed because she had recently had a miscarriage and noted that she was "sad" that her younger sister had gotten married the previous week. R. 219. Dr. Talbot noted that there were some signs of relapse, but determined that Stanley was stable and advised her to continue with her current medications. Id. Dr. Talbot's diagnosis remained a major depressive disorder in full remission and he again assigned a GAF score of 60. Id. One week later, on October 22, 2004, Dr. Talbot modified his diagnosis to a severe, recurrent major depressive disorder, assigned a GAF score of 50, and altered Stanley's medication. R. 218. He recorded Stanley's complaints and noted, again, that there were some signs of relapse. Id.

Dr. Talbot's diagnosis and GAF assignment remained consistent from late 2004 through May 2006. R. 203-17, 250-54, 270-73. Stanley's symptoms fluctuated as she experienced periods of relapse and periods of improvement and her medications were periodically adjusted. Id. Dr. Talbot noted adequate self care throughout the period. Id. On November 4, 2004, Stanley complained of "bad anxiety attacks at night" and stated that if she died, "she wouldn't

care." R. 217.  However, on November 17, 2004, Stanley stated that she no longer felt that way and reported that she was generally feeling "good" with some "on and off days" and periodic "anxiety attacks." R. 216.  Stanley noted that she was fighting with her boyfriend, which she found to be depressing. Id.  Dr. Talbot noted that she had shown some improvement. Id.  On December 14, 2004, Stanley reported that she was generally feeling "alright, but a little depressed" and complained of "a little panic attacks in morning," but reported that her relationship with her boyfriend had improved. R. 215.

On January 12, 2005, Stanley reported that she was feeling depressed because her cousin's infant son had recently died. R. 214.  She also noted that she had been fighting with her boyfriend and arguing with her parents and others. Id.  On February 2, 2005, Dr. Talbot noted signs of relapse but indicated that Stanley was stable. R. 213.  Stanley presented similar complaints and noted that she had broken up with her boyfriend and was continuing to argue with her parents. Id.  Dr. Talbot referred Stanley to meet with a "therapist for supportive psychotherapy, but she refused." Id.  Stanley reported similar complaints on February 16, 2005, but again declined referral to a therapist. R. 212.  In March 2005, Stanley was referred to a licensed clinical social worker for therapy. R. 209-11.  Stanley continued with therapy in April 2005. R. 208.  On April 14, 2005, Dr. Talbot noted some improvement in her status. Id.  Stanley continued attending therapy appointments in May 2005 and Dr. Talbot noted continued improvement, recording that Stanley had reported less frequent panic attacks and that she generally felt "alright." R. 206.

By June 2005, Stanley reported that she generally felt "alright," was "not feeling depressed" and was experiencing less difficulty with panic attacks. R. 204-205.  On June 6,

2005, Dr. Talbot noted that Stanley needed to schedule a new therapy appointment; he noted the same on June 27, 2005, but indicated that Stanley stated "she d[id'nt] feel like it." Id. In July 2005, Stanley again stated that she felt "alright and better" and that her panic attacks were "not too bad." R. 203. Dr. Talbot noted that Stanley had resumed therapy sessions. Id.

In August 2005, Stanley stated that she generally felt "sad and depressed most days," but noted that any panic attacks were "not too bad." R. 254. In September 2005, she stated that she felt "good, but depressed off and on." R. 253. She complained of fewer, but more severe panic attacks. Id. By November 2005, Stanley stated that she felt "good and alright" and that she was not feeling depressed. R. 252. In December 2005, Stanley reported worsened depression and more frequent panic attacks and stated that she was "distressed" about things going on in her life. R. 251. Dr. Talbot noted some slight improvement during their next session in January 2006. R. 250, 273, 494. In February 2006, Stanley reported symptoms of depression and panic attacks. R. 272, 495. In March 2006, Stanley stated that she felt "alright, but still depressed." R. 271, 496. In May 2005, Stanley stated that she felt "good and not depressed" and reported only a couple of panic attacks. R. 270, 497.

In June 2006, Stanley reported that she felt "good" and that "everything is going alright." R. 269, 498. She noted that her depression was improved and that she had experienced only a couple of less severe panic attacks. Id. Dr. Talbot modified his diagnosis to Major Depressive Disorder in partial remission and assigned a GAF score of 65.[5] Id. This diagnosis and GAF score remained consistent through October 2006. R. 267-68, 498-501. In July 2006, Stanley stated that she felt "good" but "a little depressed." R. 268, 499. In August 2006, she stated that

---

[5] A GAF score in the 61-70 range indicates that one has some mild symptoms or some difficulty in social, occupational or school functioning, but generally functions pretty well and has some meaningful relationships. See DSM-IV-TR.

she was depressed and lacked energy and ambition. R. 267, 500. In October 2006, she stated that she felt "alright, but depressed" and stated that she had been housebound for two weeks. R. 501. On December 18, 2006, Dr. Talbot modified his diagnosis to a severe, recurrent major depressive disorder and an anxiety disorder and assigned a GAF score of 55. R. 502. These diagnoses remained consistent until September 5, 2007, with GAF assignments of either 55 or 60 during those months. R. 502-511. Stanley continued therapy during that time period. Id.

Dr. Talbot's visit notes indicate that Stanley reported symptoms of depression, panic attacks and sleeping issues from 2007 through 2009 and exhibited signs of relapse and signs of improvement at various times. R. 503-525. Dr. Talbot continued to manage and adjust Stanley's medication regimen to respond to her symptoms. Id. From October 2007 through January 2008, the diagnoses remained consistent, with major depressive disorder being categorized as either severe or moderate at different points. R. 512-518. Stanley's GAF score of 60 was consistent throughout the period. Id. Stanley terminated her treatment with Dr. Talbot in January 2008 because she found a clinical specialist closer to her home. R. 518. She resumed treatment with Dr. Talbot in June 2009. R. 519. Dr. Talbot diagnosed a recurrent major depressive disorder in partial remission and an anxiety disorder and assigned a GAF score of 60. Id. This diagnosis remained consistent through August 2009, when Dr. Talbot noted that Stanley exhibited signs of relapse. R. 519-523. In September 2009, Dr Talbot diagnosed a moderate, recurrent major depressive disorder and assigned a GAF score of 60. R. 525. In October 2009, he diagnosed severe, recurrent major depressive disorder and assigned a GAF score of 60. R. 524. Stanley stated that she felt depressed and hopeless and informed Dr. Talbot that her "panic attacks [were] out of control." Id.

### b.   Assessments Regarding Mental Impairments

On September 11, 2004, Dr. Barbara Sheedy performed a consultative examination of Stanley.  R. 187-191.  Stanley reported that she was currently living with a cousin.  R. 187.  She stated that she had a boyfriend, but did not have other friends.  Id.  She reported that she was able to drive, prepare meals and do laundry.  R. 188.  Stanley stated that she would experience periods in which she had no desire to spend time with other people or do anything.  Id.  Dr. Sheedy noted that Stanley was "pleasant, socially appropriate and cooperative" and "appeared to work to the best of her ability" on the mental status tasks she was asked to complete.  Id.

Dr. Sheedy determined that Stanley "would not be considered functionally literate," because she had a reading ability "well below a third grade level."  Id.  Dr. Sheedy administered the Wechsler Adult Intelligence Scale – Third Edition and Stanley registered "a verbal IQ score of 78, a performance IQ of 69, resulting in a Full Scale IQ score of 72. . . . [which is] within the borderline range of intellectual functioning."  R. 188-89.  Dr. Sheedy diagnosed Stanley with dysthymic disorder, borderline intellectual functioning and an adjustment disorder with mixed emotional features and assigned a GAF score of 60.  R. 190.  Dr. Sheedy noted that Stanley "clearly has intellectual abilities that are well below the average, generally within the borderline range" and that Stanley was limited by a combination of depression and anxiety.  Id.  She, however, determined that Stanley's attention and concentration were "fairly good," that she could get around the community independently and that "she would do her best to get along with coworkers and supervisors."  Id.  She opined that Stanley would do best in a setting geared toward the needs of similar individuals or a setting that is "fairly routine and repetitive."  Id.

On September 30, 2004, Dr. Burke, a state agency psychiatrist, completed a Psychiatric Review Technique form. R. 173-186. Dr. Burke determined that Stanley was impaired by a dysthymic disorder (20 C.F.R. Part 404, Subpart P, Appendix 1, listing 12.04), borderline intellectual functioning (listing 12.05) and an adjustment disorder (listing 12.06). R. 173-182. He determined that, due to these disorders, Stanley would experience: 1) mild restriction of activities of daily living; 2) mild to moderate difficulty in maintaining social functioning; 3) moderate difficulty in maintaining concentration, persistence, or pace; and 4) no episodes of decompensation. R. 183. In his consultant's notes, Dr. Burke noted that he had considered Stanley's functional illiteracy and the IQ scores – characterized as in the "borderline range" – referenced in Dr. Sheedy's consultative examination report. R. 185.

Dr. Burke also completed a Mental Residual Functional Capacity Assessment ("MRFC") form. R. 192-195. He concluded that Stanley would experience: 1) moderate to marked limitation in understanding and remembering detailed instructions; 2) moderate limitation in the ability to: carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in the work setting; 3) no significant limitation to moderate limitation in the ability to interact appropriately with the general public; and 4) no significant limitation in the ability to: remember locations and work-like procedures; understand, remember and carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an

ordinary routine without special supervision; make simple work related decisions; ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independently of others. R. 192-93.

In his MRFC assessment, Dr. Burke discussed Stanley's medical history and her medical records from Tri-City and noted that no current therapy reports were available. R. 194. He discussed Dr. Sheedy's September 2004 consultative examination, noting the recorded IQ scores and the assignment of a GAF score of 60. Id. Dr. Burke determined that Stanley was "capable of short, simple demands of understanding [and] memory" and that she "gets around independently." Id. He concluded that Stanley was "capable of simple, repetitive tasks [and maintaining attention, concentration and persistent pace], in independent or small group settings." Id. He determined that Stanley "[c]an relate adequately around simple matters" and noted that she had a boyfriend, visited cousins and could get around. Id. He found that Stanley could "do simple repetitive tasks [with] appropriate guidance in low stress situations." Id.

On January 16, 2006, Dr. Talbot wrote a letter to Stanley's attorney regarding his opinion of Stanley's "ability to work in gainful employment." R. 248-49. Dr. Talbot stated that he had been treating Stanley for "major depression, mood swings, and panic symptoms" since August 2003. Id. He noted that "[Stanley's] depression has improved somewhat, but she continues to complain of anxiety and panic symptoms" and noted that Stanley complained of difficulties with concentration and memory. Id. Dr. Talbot stated that "[Stanley] has been unable to work in gainful employment for any significant period of time" and described Stanley's statements

regarding her previous employment at K-Mart and at her father's business.  Id.  He opined, in part, that "Ms. Stanley is unable to engage in gainful employment for at least 12 months.  Her functional limitations with regard to work are consistent with her mental symptoms and impairments.  She is not a malingerer."  Id.

On October 22, 2009, Dr. Talbot again concluded that Stanley would be unable to engage in gainful employment for at least twelve months, quoting his previous statement from 2006.  R. 490-493.  Dr. Talbot noted that Stanley exhibited: 1) marked difficulties ("either continuously or intermittently, in functioning independently, appropriately and/or effectively")  in daily living activities including paying bills, using public transportation, planning daily activities, and initiating and participating in activities independent of supervision and directions; 2)  marked difficulties in maintaining social functioning including getting along with friends, exhibiting social maturity, responding to supervision and holding a job; 3) marked performance and concentration difficulties in independent functioning, concentration, persistence in tasks, ability to complete tasks in a timely manner, and pace and ability to assume increased mental demands associated with competitive work; and 4) repeated episodes of deterioration or decompensation in stressful environments such as work, work-like settings or elsewhere, indicated by an inability to appropriately accept supervision, withdrawal from situations, exacerbation of symptoms of illness, poor attendance, inability to cope with schedules and poor decision making.  Id.  Dr. Talbot diagnosed major depression, attention deficit disorder and obesity and assigned Stanley a GAF score of 60.  Id.

2. *ALJ Hearing*

The ALJ conducted an earlier hearing on January 18, 2006. R. 274-313. During an administrative hearing (after remand) on October 8, 2009, the ALJ heard testimony from Stanley and from vocational expert ("VE") Jeff Goldberg. R. 539-97. In making his findings, the ALJ also considered Stanley's testimony during the January 2006 hearing.

a. Stanley's Testimony

During both the 2006 and 2009 hearings, Stanley testified that she had depression, anxiety, problems sleeping and a learning disability. R. 282, 550. Stanley had been enrolled in special education classes since the first grade. R. 578. She graduated from the Malden High School special education program in four years, where she received help with reading and writing. R. 284, 579. Stanley testified that she had been suicidal at some points in high school and was first diagnosed with depression in the tenth or eleventh grade after being referred to a program by employees at Malden High School. R. 286-88. She was first prescribed antidepressants during that time period. Id.

During the January 2006 administrative hearing, Stanley testified that she was taking antidepressants, anti-anxiety medication, a mood stabilizer and a medication for insomnia. R. 301. She agreed that it was accurate to say that she had a low third-grade reading level and problems with mathematical computations. R. 285. Stanley stated that she was unable to read and understand the notification of the administrative hearing that had been sent to her and needed to have her mother explain it to her. Id. She testified that her depression, which could become worse than usual for periods of days or months at a time, manifested itself in episodes of crying, feeling scared and not wanting to leave her house or bedroom. R. 289.

During the 2006 hearing, Stanley testified that her anxiety, also first diagnosed during high school, causes panic attacks, which include heavy breathing, nervousness, sweating, fear and the feeling that she cannot move. R. 290. She stated that she has physical reactions from the panic attacks and that her anxiety affects her ability to sleep and function generally. Id. She testified that she experiences symptoms on a daily basis or multiple times per week. R. 292. Stanley stated that the symptoms can result in her not wanting to leave her bedroom or home for fear of triggering a panic attack and noted that she is nervous talking to other people. R. 291. Stanley testified that she receives counseling for her anxiety, which she believed kept her leveled, but acknowledged that "some days [are] better than other days" and that, since she was first diagnosed with anxiety, she did not believe her symptoms had changed. Id.

During the 2006 hearing, Stanley testified that she had been prescribed medication for a sleep disorder that caused irregular sleep patterns, including instances of no sleep for a number of days followed by extended periods of sleep for up to 24-48 hours. R. 292-93. She stated that her medication "sometimes" improves her ability to sleep, but testified that the disorder causes her to have difficulty keeping appointments and affects her ability to concentrate and complete tasks. R. 293-94.

Stanley also testified during the 2006 hearing that she was limited by a learning disability and stated that she was unable to read and understand a newspaper or read, understand and complete a job application without assistance. R. 297. She testified that she is unable to take public transportation because she cannot understand the schedules and because being in a crowded public place can affect her anxiety. R. 299. She stated that a doctor had recently informed her that she had some precancerous cells, causing her concern. R. 300-01. Stanley

testified that a "good day" would consist of being able to "get out of the house and accomplish something." R. 295-96. She considered going to the mail box or going to the grocery store an accomplishment and stated that if she leaves the home, it is generally to visit a family member. R. 296. She testified that during a "bad day," she would not even get out of bed. Id.

During the 2006 hearing, Stanley testified that her weight affected her depression, anxiety and confidence; she stated that her depression and anxiety also affected her weight because her medications caused her to gain weight. R. 294-95. During the 2009 hearing, she reiterated that, because she is severely overweight, she had considered gastric bypass surgery, but was scared to follow through. R. 567. She noted, additionally that part of the reason she did not go forward with the surgery was that her doctors were concerned about her depression. R. 575.

During the 2009 hearing, Stanley testified that she had appointments with Dr. Talbot every two weeks or every month. R. 553. She stated that her aunt, sister or a friend would usually accompany her to the appointments. R. 568-69. She testified that she took antidepressants prescribed by Dr. Talbot, describing the different medications she had tried in the past and noting that she had gained forty pounds in recent months as a result her medication. R. 567-68. Stanley also described daily pain in her right leg as a result of a car accident. R. 567.

Stanley further testified she had two friends during high school and that they have remained friends. Id. She stated, as she did during the 2006 hearing, that she worked at K-Mart on a part time basis for three to six months while in high school. R. 283-84, 548. While working there, she had difficulty completing the list of tasks assigned during her shift and would sometimes work too slowly or not remember what to do. R. 283-84, 577. When she was moved to cashier, she had difficulty giving customers the correct change, despite working with an

automated register, and her drawer was often short.  Id.  Stanley testified that she had also previously done secretarial work at her father's paving company on and off for a couple of years, where she would answer phones and take messages to set up appointments, but would have difficulty relaying accurate information.  R. 549, 575-76, 589.  She stated that she tried filing and other tasks, but was eventually let go.  Id.

During the 2009 hearing, Stanley stated that she was living with her 62 year old aunt and alternated with her in cleaning and caring for the apartment and cooking.  R. 555-56, 570.  She testified that she often cannot leave her home because of anxiety.  R. 557.  She stated that, if her medication is working, she is able to go food shopping with her aunt or take her dog for a walk. Id.  She testified that it took her five or six attempts to obtain her learner's permit and that she had to take her driving test twice.  R. 558-59.  Stanley stated that she occasionally tries to visit friends in her car, but noted that she has a hard time following directions or a map and has difficulty reading street signs.  R. 560-61.  She stated that her brother's attempt to show her how to use a GPS was unsuccessful.  R. 591.  She stated that she knows the location of the grocery store and can drive there by herself, but will often forget her grocery list and need to return home to retrieve it.  R. 564.  However, she noted no problem checking out and she stated that "I try to stay in what the budget is."  Id.

Stanley reiterated that she could not take public transportation because she becomes nervous and gets lost.  R. 561.  She stated that she had a cell phone and would sometimes speak with her friends by phone.  R. 563.  She noted that she did not have a computer and did not know how to use one.  Id. Stanley testified that during the day she would watch television, sit or take a walk outside or visit with a friend that stopped by and that, occasionally, she would get picked

up by friends and go out for coffee or lunch.  R. 565, 569.  Stanley testified that she did not need

assistance with self-care including bathing, dressing and feeding herself.  R. 565.  She stated that

she had difficulty paying bills because she has trouble properly filling out a check.  R. 573.

Stanley testified that, while she may be able to perform certain jobs, the anxiety of actually

leaving the house to get there makes her feel that "the world's going to come at [her]."  R. 595.

### b. VE's Testimony

During the October 2009 administrative hearing, the ALJ presented a hypothetical to

vocational expert Jeff Goldberg:

> Let me ask you to assume that we are talking about a person who is 27 years old.
> And let's assume this person has a high school diploma, but let's assume this
> person would fall into the category of having a limited education.  And let's
> assume this person has no past relevant work.  And let's assume this person, first,
> let's assume this person could perform work without any exertional, postural, or
> environmental limitation; could understand and remember simple oral
> instructions; could concentrate for two hour periods over an eight hour day on
> simple tasks; could interact appropriately with coworkers and supervisors; and
> could adapt to changes in the work setting.  And, further, let's assume this person
> should avoid frequent interaction with the general public in a work setting, and
> would require work which did not require her to perform mathematical
> computations.  With those abilities and limitations, are there jobs in the national
> or regional economy such a person could perform?

R. 584-585.  The VE testified that such a person would be able to perform the sedentary,

unskilled tasks of a table worker or the light, unskilled work of a bottling attendant.  R. 585.  He

testified that an individual with the same mental abilities as the hypothetical worker, but with a

limitation of light work only, would also be able to perform the jobs and stated that there are no

mathematical computations, writing or speaking requirements involved in either position.  Id., R.

587.

In response to a revised hypothetical, the VE testified that an individual with the same limitations who would be "unable to maintain concentration persistence or pace for two hour periods over an eight hour day" would not be able to perform jobs in the national or regional economy. R. 585-56. The VE also testified that an individual who would miss "three to four days per month due to symptoms from mental impairments" would be unable to work. R. 588.

### 3. Findings of the ALJ

Following the five–step process, 20 C.F.R. § 416.920, at step one, the ALJ found that Stanley had not engaged in substantial gainful activity since September 16, 2003, the date of application for benefits. R. 337. Stanley does not dispute the ALJ's finding at step one.

At step two, the ALJ found that Stanley had the severe impairments of "depression, anxiety and borderline intellectual functioning" and that "[t]he resulting restrictions on her ability to concentrate due to these conditions significantly impair her ability to do basic work activities." R. 338. Stanley disputes the ALJ's finding at step two. D. 16 at 14.

At step three, the ALJ found that Stanley did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. R. 343. The ALJ noted that he considered claims under listing 12.00, Mental Disorders, but found that the record did not establish marked difficulties or repeated episodes of decompensation. Id. The ALJ discussed the requirements under listing 12.05(c), Intellectual Disability,[6] and determined that Stanley "[had] not established deficits in adaptive functioning sufficient to satisfy the requirements" of the listing. R. 345. Stanley argues

---

[6] Listing 12.05 was amended effective September 3, 2013 to replace the term "Mental Retardation" with the term "Intellectual Disability." See Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46499, 46499–46500 (Aug. 1, 2013).

that the ALJ erred in failing to determine that her impairments meet the requirements of Listing 12.05(c).  D. 16 at 14.

Before reaching step four, the ALJ determined Stanley's RFC:

> [C]laimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: able to understand and remember simple oral instructions, could concentrate for 2 hour periods over 8 hour workday on simple tasks, could interact appropriately with coworkers and supervisors, could adapt to changes in the work setting, should avoid frequent interaction with general public, and would require work which would not require her to perform mathematical computations.  She has no exertional, postural or environmental limitations.

R. 345.  The ALJ determined that although Stanley's medically determinable impairments could reasonably be expected to cause her alleged symptoms, Stanley's statements as to the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the RFC assessment.  R. 346.  Stanley disputes the ALJ's RFC determination.

At step four, The ALJ determined that Stanley had no past relevant work.  R. 347.  Stanley does not dispute the ALJ's finding at step four.

At step five, the ALJ found that after considering Stanley's age, education, work experience and RFC, there were jobs in significant numbers in the national economy that Stanley could still perform and that, therefore, she was not disabled under section 1614(a)(3(A) of the Social Security Act.  R. 347-48.  Stanley disputes the ALJ's finding at step five.

## C.   Stanley's Challenges to the ALJ's Findings

Stanley contends that the ALJ erred by (1) failing, without explanation, to afford adequate weight to the opinion of her treating psychiatrist, Dr. Talbot; (2) determining that her impairments did not meet or equal the requirements of listing 12.05(c); (3) improperly assessing

her own credibility; and (4) improperly assessing her RFC in light of substantial evidence.  For the reasons explained below, these arguments fail.

### 1.    The ALJ Did Not Err in Weighing the Opinion Evidence

Stanley argues that Dr. Talbot's opinion "clearly illustrates [that her] mental impairments medically meet or [ ] equal" the requirements of listing 12.04, Affective Disorders.  D. 16 at 11.  She contends that the ALJ erred by "cherry pick[ing]" evidence and "completely ignoring" Dr. Talbot's opinion without explanation, thereby failing to comply with the requirements of 20 C.F.R. § 404.1520(a) and warranting a remand.  Id. at 12-14.  She argues that the ALJ improperly relied on limited episodes of improvement to support his findings that Stanley's functioning is only moderately limited.  Id.  Stanley also argues that her treatment records between January 2006 and October 2009 were "relatively ignored by the ALJ."  Id.

A treating source's medical opinion is to be given controlling weight when the opinion is well-supported by the record and is not inconsistent with other substantial evidence.  SSR 96-2p, 1996 WL 374188, at *1; Clayton v. Astrue, No. 09–10261–DPW, 2010 WL 723780, at *6 (D. Mass. Feb.16, 2010).  While the medical opinion of a treating source is generally afforded more weight than that of a non-treating source, an ALJ may properly give less weight to a medical opinion that is inconsistent with the record as a whole or unsubstantiated by treatments notes.  20 C.F.R. § 404.1527(c); see Green v. Astrue, 588 F. Supp. 2d 147, 154 (D.Mass.2008); Avery v. Astrue, No. 11-30100-DJC, 2012 WL 4370270, at *10 (D. Mass. Sept. 21, 2012) (explaining that the ALJ may give less weight to a treating source's opinion if it is inconsistent with the record as a whole); Blanchette v. Astrue, No. 08–CV–349–SM, 2009 WL 1652276, at *7 (D.N.H. June 9,

2009) (finding that the ALJ properly gave less weight to a treating source's opinion that was not supported by treatment records or tests).

Because he did not give controlling weight to the opinion of Stanley's treating source, the ALJ was required to explain his decision, giving "good reasons" for giving Dr. Talbot's opinion less weight than the opinion of Dr. Burke. 20 C.F.R. §§ 404.1527, 416.927. Because he explained that he found Dr. Talbot's opinion inconsistent, and Dr. Burke's consistent, with the weight of the record and because these findings were supported by substantial evidence, there was no error. Id. His conclusions and his determination that Dr. Talbot's opinions were not entitled to controlling weight were reasonable and supported by substantial evidence. 42 U.S.C. § 405(g).

An ALJ evaluates the opinion of a non-examining source by assessing the extent to which it considers all relevant evidence, including opinions of treating or examining sources. 20 C.F.R. § 404.1527(c). "Generally, the more consistent an opinion is with the record as a whole, the more weight [an ALJ] will give to that opinion." Id. The ALJ gave weight to the assessment of Dr. Burke as consistent with the record as a whole. R. 346. Because the ALJ determined that Dr. Burke's opinion was consistent with the record, he was entitled to give it greater weight. 20 C.F.R. § 404.1527(c). The ALJ gave less weight to the statements of Dr. Talbot, Stanley's treating source, that Stanley would not be able to engage in gainful employment for at least twelve months, explaining that he found the statements inconsistent with the record as a whole. R. 346.

The ALJ made clear that he considered and based his findings on the record as a whole. R. 345. The ALJ thoroughly discussed Stanley's medical history, the available opinion evidence

and the testimony from both administrative hearings.  Stanley and the Commissioner agree, D. 16 at 10, D. 19 at 12, that while an ALJ's decision must be based upon a consideration of the entire record, an "ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." Ramos-Birola v. Astrue, No. 10–cv–12275–DJC, 2012 WL 4412938, at *20 (D. Mass. Sept. 24, 2012) (quoting N.L.R.B. v. Beverly Enters.–Mass., Inc., 174 F.3d 13, 26 (1st Cir. 1999) (internal quotation mark omitted)); see also Miller v. Astrue, No. 99–CV–12018–RBC, 2011 WL 2462473, at *11 (D. Mass. June 16, 2011) (noting that "[t]here is no requirement that an ALJ discuss every bit of evidence in the record when penning his decision. . . [and] [t]he failure to mention a particular record does not evince a failure to consider it").

The ALJ initially discussed records from Tri-City indicating that Stanley was assigned GAF scores in the 58-60 range in January, April, July and October of 2000.  R. 338-339.  Stanley contends that treatment records from Tri-City are irrelevant to her case because they predate her SSI application of September 13, 2003.  D. 16 at 13.  However, the ALJ properly noted that, although supplemental security income is not payable for the time period prior to the month following the date of application, he considered the complete medical record in accordance with 20 C.F.R. § 416.912(d) (noting, in part, that before an ALJ determines whether an individual is disabled, he will "develop [a claimant's] complete medical history for at least the 12 months preceding the month in which [she files an] application").  R. 336.

The ALJ then discussed Stanley's treatment at the Psychiatric Group of North Shore beginning in August 2003.  R. 339.  He noted that Dr. Talbot diagnosed severe, recurrent major depression and assigned a GAF of 50.  Id.  The ALJ discussed treatment notes for each month

through January 2004, during which time Stanley was assigned GAF scores in the 50-55 range. Id. He noted the January 2004 consultative examination by Dr. Menken that Stanley had not been able to attend. R. 340. He noted that Stanley resumed treatment with Dr. Talbot in April 2004 after returning from San Francisco and Chicago. Id.

The ALJ discussed the September 2004 consultative examination by Dr. Sheedy, who diagnosed dysthymic disorder, borderline intellectual functioning and adjustment disorder and assigned a GAF of 60. Id. He noted Stanley's IQ scores. Id. During the consultative examination, Dr. Sheedy had determined that despite her limitations, Stanley's attention and concentration were "fairly good," that "she would do her best to get along with coworkers and supervisors" and that she would do best in a "fairly routine and repetitive setting." R. 190. The ALJ then discussed Dr. Burke's September 2004 assessment, in which he considered Dr. Sheedy's report and determined that Stanley would experience mild to moderate limitations from her mental impairments and would be "capable of simple, repetitive tasks [and maintaining attention, concentration and persistent pace], in independent or small group settings." R. 194, 340. The ALJ then discussed Dr. Talbot's treatment records from October 2004 through October 2009, detailing Stanley's symptoms during the time period and describing the medicinal and therapeutic treatment steps taken. R. 340-43.

The ALJ gave little weight to Dr. Talbot's statements that, due to her mental impairments, Stanley would not be able to engage in gainful employment for at least twelve months because they were not consistent with the record as a whole. R. 346. With regard to the 2006 opinion, the ALJ stated that it had "little significant probative value [because] the determination of the claimant's ability to work is a finding reserved to the Commissioner" and

because the opinion was not supported by Dr. Talbot's treatment notes.  R. 338; 20 C.F.R. § 416.927(d) (noting that opinions on some issues are reserved to the Commissioner and that "[a] statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that [a claimant] is disabled").  Given that Dr. Talbot's 2009 opinion, R. 490-493, was identical to the 2006 opinion, and because his treatment notes, R. 502-525, remained largely consistent throughout 2009, the ALJ's conclusion applies similarly to Dr. Talbot's 2009 opinion.  Specifically, the ALJ determined that, while the treatment notes indicated that Stanley "has periodic trouble sustaining concentration and experiences significant anxiety in public places," they also indicated that Stanley "consistently presents as alert, with normal affect, adequate self care, normal motor behavior, and generally reports being stable upon psychopharmacological medication" and the "longitudinal record" of Stanley's treatment illustrated moderate mental functional limitations.  R. 338, 346.

Stanley argues that her GAF scores illustrate that the ALJ did not properly assess the severity of her condition.  D. 16 at 12-13.  However, "low GAF scores alone do not compel a finding of disability."  Bernier v. Astrue, No. 09-12167-DJC, 2011 WL 1832516, at *3 (D. Mass. May 13, 2011) (citing 65 Fed. Reg. 50746, 50764-65 (August 21, 2000), which notes that there is no direct correlation between the GAF scale and the severity requirements in section 12:00, Mental Disorders).  While a GAF score of 50 may indicate serious symptoms or any serious impairment in social, occupational, or school functioning, a GAF score, alone, does not provide a fact finder with "significant insight into whether [an individual] can perform some type of competitive work."  Querido v. Barnhart, 344 F. Supp. 2d 236, 246 (D. Mass. 2004).

The ALJ concluded that Dr. Talbot's treatment notes indicated that Stanley, despite certain difficulties, would be able to perform simple, repetitive work that does not require exposure to the general public. R. 338. The ALJ summarized Stanley's medical history and records between 2000 and 2009 and determined that "the longitudinal record indicates a person with moderate mental functional limitations as indicated by GAFs of 55-65." R. 346. Although Stanley's symptoms and diagnoses fluctuated through periods of relapse and improvement from 2003 through 2009, Dr. Talbot's opinion – that Stanley would experience repeated episodes of decompensation and marked difficulties in daily living, social functioning and duties associated with competitive work – conflict with treatment notes indicating more moderate limitations with appropriate medicinal and therapeutic treatment. See Nobrega v. Barnhart, No. 05-30204-KPN, 2006 WL 2358886, at *7 (D. Mass. Aug. 3, 2006) (noting that, when the opinion of a treating source is internally inconsistent or based on a claimant's subjective complaints, rather than objective evidence, an ALJ is responsible for weighing it against other objective medical evidence and opinion evidence). There is substantial evidence from Dr. Talbot's treatment notes and from Stanley's own testimony in 2006 and 2009 that Stanley's limitations are consistent with moderate, rather than marked, functional restrictions.

Stanley's argument, D.16 at 13, that the ALJ ignored her treatment records between January 2006 and October 2009 is also unavailing. Indeed, as Stanley stresses in her argument, D. 16 at 11, Dr. Talbot's opinion was consistent and unchanged between 2006 and 2009. His opinion stems from his treatment of Stanley during that time period, which is reflected in treatment notes generally indicating moderate, rather than marked, limitations. R. 502-525. Given the ALJ's reasonable findings in light of the record and his reasonable explanations for the

weight afforded to the conflicting opinion evidence, the ALJ's determinations are supported by substantial evidence and are conclusive. Ortiz, 955 F.2d at 769. Accordingly, there was no error.

## 2.    The ALJ Properly Considered and Assessed Intellectual Disability

In reviewing the Commissioner's 2006 determination, this Court (Wolf, J.) determined that the ALJ had either failed to fully consider 20 C.F.R. Pt. 404, Subpt. P, App. 1, listing 12.05, or failed to apply it properly. R. 361-63. The Court then concluded that, although the ALJ determined that Stanley did not meet or equal the listing because the record did not support "marked [restrictions or] difficulties or repeated episodes of decompensation" necessary to demonstrate the required level of severity under 12.05(d), R. 19, R. 361, the ALJ did not discuss the criteria of 12.05(c) in his decision. Id. Under the introductory paragraph of listing 12.05, "[i]ntellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. If intellectual disability is established, the required level of severity can be met when a claimant demonstrates a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Id. at 12.05(c)

Stanley argues that her impairments meet the requirements for listing under 12.05(c). D. 16 at 14. She argues that because she registered a performance IQ of 69 and is limited by a "mental impairment imposing an additional and significant work-related limitation of function," she meets the requirements of the listing. Id. Upon remand and after the 2009 hearing, the ALJ

discussed the requirements under listing 12.05(c) and determined that Stanley "[had] not established deficits in adaptive functioning sufficient to satisfy the requirements" of the listing. R. 345. The ALJ's determination that Stanley did not exhibit the requisite deficits in adaptive functioning to establish intellectual disability is not error. In considering the deficits in adaptive functioning and the other requirements of listing 12.05, the ALJ properly considered and applied the listing, correcting the error in the 2006 decision.

To establish intellectual disability by meeting the requirements of any subparagraph under listing 12.05, Stanley must also satisfy the introductory paragraph of the section, demonstrating the requisite adaptive deficits during the developmental period. Libby v. Astrue, 473 Fed. App'x 8, *8 (1st Cir. 2012) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(A)) (noting that "[t]he general introduction to the Mental Disorders listings provides that satisfying the listing requires satisfying both the diagnostic description in the introductory paragraph and the criteria of a subparagraph"). 20 C.F.R. § 404, App. 1, 12.00(C)(1) offers a list of examples of adaptive activities including "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office" and states that these activities are assessed "by their independence, appropriateness, effectiveness, and sustainability."

Substantial evidence supports the ALJ's findings that Stanley did not establish deficits in adaptive functioning necessary to demonstrate intellectual disability. Libby, 473 Fed. App'x 8, at *8. Stanley was not diagnosed with intellectual disability by Dr. Sheedy, Dr. Burke or Dr. Talbot. R. 173-195, 248-249, 490-493. Despite Stanley's mental limitations, she was able to graduate from the special education program at Malden High School in four years. R. 284, 579.

Despite her limitations and symptoms, Stanley exhibited an ability to keep and attend medical appointments since 2000. Though she is usually unable to take public transportation, R. 299, she was able to obtain her driver's license and is able, with some difficulty, to navigate in areas with which she is familiar. R. 560-64. Stanley testified she alternates with her aunt in cleaning, cooking and taking care of their apartment. R. 555-56, 570. She testified that she did not need assistance caring for herself. R. 565. She stated that she sometimes communicates with friends by cell phone and will occasionally accompany them out for lunch or coffee. R. 563, 565, 569. Despite a low reading level and difficulty with mathematical computations, R. 285, and difficulty during her previous employment, R. 283-284, 548-49, 575-76, 589, there is substantial evidence from which the ALJ could determine that Stanley did not exhibit the requisite deficits in adaptive functioning to satisfy the requirements of 12.05(c). Accordingly, there was no error. 42 U.S.C. § 405(g).

### 3. The ALJ Did Not Improperly Assess Stanley's Credibility

Stanley contends that the ALJ erred in evaluating her credibility because he improperly assessed her subjective complaints. D. 16 at 15. Stanley also contends that the ALJ failed to fairly and accurately evaluate her symptoms and her activities of daily living. D. 16 at 15-17.

The ALJ is tasked with weighing conflicting evidence. See Seavey v. Barnhart, 276 F.3d 1, 10 (1st Cir. 2001). Just as the ALJ was entitled to discount Dr. Talbot's opinion because he determined it was inconsistent with his treatment notes, R. 346, the ALJ's determination that Stanley's subjective complaints of limitation were inconsistent with substantial evidence was not error. The ALJ found the "longitudinal record" of Stanley's treatment history, which included consistent GAF scores in the 55 to 65 range, indicative of an individual with moderate

limitations of mental function. R. 346. Stanley concedes, D. 16 at 11, that Dr. Talbot's letter from January 2006 "describes the same symptoms and limitations discussed in his Medical Source Statement three years later." In addition to the consistent treatment records, Stanley offered largely consistent testimony during the 2006 and 2009 administrative hearings. R. 274-313, 539-97. Because the ALJ's credibility determination is supported by substantial evidence and accompanied by reasonable explanation, it is conclusive. Ortiz, 955 F.2d at 769.

In evaluating the credibility of a claimant's statements about her symptoms, an ALJ follows a two-step process. SSR 96–7p, 1996 WL 374186, at *2 (Jul. 2, 1996). The ALJ must first "consider whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the individual's pain or other symptoms." Id.; 20 C.F.R. § 404.1529. When an underlying impairment has been shown to exist, the ALJ moves to step two of the credibility analysis. 20 C.F.R. § 404.1529(b). The ALJ must "evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." Id.; SSR 96–7p, 1996 WL 374186, at *2.

An ALJ must consider whether there are inconsistencies between the objective medical evidence and the claimant's own statements about her symptoms. 20 C.F.R. §404.1529(c). If an individual's statements about her symptoms are not supported by objective medical evidence, the ALJ must determine the credibility of the statements based on any relevant evidence in the record. SSR 96–7p, 1996 WL 374186. Relevant evidence can include the individual's own statements and information or statements provided by physicians, psychologists or other persons about the effect of the symptoms on the individual. Id., at *5. The ALJ's decision "must contain

specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id., at *2.

At step one of the process, the ALJ determined that "[Stanley's] medically determinable impairments could reasonably be expected to cause [her] alleged symptoms." R. 346. However, at step two, the ALJ determined, in consideration of the objective medical evidence and other evidence, that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC] assessment." Id. He concluded that "[Stanley]'s statements concerning her impairment and its impact on her ability to work . . . are considerably more limited and restricted than is established by the medical evidence and her contemporaneous statements to treating sources" which indicated that she "is able to engage in a rather broad level of activity and experience only periodic episodes of severe mental difficulty surrounding a miscarriage in August 2004 and the marriage of [her] younger sister in the Fall of 2004." R. 347. He determined that "her limitations are self imposed restrictions not supported by the medical evidence" and that her "allegations of disabling anxiety and depression are not medically supported" in the record. Id. The ALJ offered specific reasons for his findings, which are supported by the entirety of the record and, accordingly, satisfy the requirements of SSR 96–7p. 1996 WL 374186, at *2 (Jul. 2, 1996).

When assessing a claimant's subjective complaints, a court should consider factors such as: the nature, onset, duration, frequency and intensity of the symptoms; precipitating or aggravating factors; the type, dosage, efficacy and side effects of any medication; treatment,

other than medication, of the symptoms; functional restrictions; and the individual's daily activities. Viveiros v. Astrue, No. 10-11902-DJC, 2012 WL 4104794, at *11 (D. Mass. Sept. 19, 2012) (citing Avery v. Sec'y of Health and Human Servs., 797 F.2d 19, 29 (1st Cir.1986) (assessing subjective complaints of pain)). Failing to specifically address each factor, however, "does not constitute legal error." Braley v. Barnhart, 2005 WL 1353371, at *6 (D. Me. June 7, 2005). The ALJ had substantial evidence to make a credibility determination. Evidence of the nature, onset, duration, frequency and intensity of the symptoms was present in Stanley's treatment records and her hearing testimony. Dr. Talbot's treatment notes indicated the type, dosage, efficacy and side effects of Stanley's medication. During the 2009 administrative hearing, the ALJ specifically inquired into Stanley's daily activities and explored issues of credibility. R. 540-597. The ALJ gave weight to evidence in the record and Stanley's own testimony that she had "difficulty interacting with the general public" and "difficulty doing math and things such as making change." R. 346.

The ALJ was also able to consider evidence of Stanley's adaptive functioning. The ALJ concluded that Stanley's functional limitations and activities of daily living were consistent with moderate restriction. R. 343-44. Stanley's ability to function, with some difficulty, on a daily basis and evidence of her ability to care for herself, keep appointments, navigate in areas she is familiar with, contribute to the upkeep of her household, and occasionally converse with and meet friends or her boyfriend provided substantial evidence. R. 555-70. While the ability to perform daily activities does not prove that a claimant is "not disabled," the ALJ may use evidence of performance of daily activities to support a negative credibility finding. See Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) (noting that performance of

household chores can be considered when determining credibility); see Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d 427, 429 (1st Cir. 1991) (finding subjective complaints of pain were not supported by substantial evidence because claimant could drive and walk without assistance).

Although Stanley's symptoms and diagnoses fluctuated during her treatment, the record includes substantial evidence that Stanley responded positively to medicinal and therapeutic treatment. R. 126-33, 171-72, 203-22, 252, 269-71, 496-501, 519. Despite instances of improvement and relapse, Dr. Talbot's treatment notes and Stanley's reported activities remained largely consistent, indicating symptoms consistent with moderate, rather than marked, limitations in daily living and social and occupational functioning.

### 4. The ALJ's RFC Finding is Supported by Substantial Evidence

Stanley also contends that the ALJ's RFC determination was not supported by substantial evidence. D. 16 at 18. She argues that, because the ALJ improperly discounted Dr. Talbot's expert opinion, ignored portions of Stanley's testimony regarding the adverse effects of her medication and the reasons for her trip to California, and failed to properly assess her credibility, the ALJ failed to comply with Social Security Ruling ("SSR") 96-8p and 20 C.F.R. § 404.1545.

Similar to a credibility determination, an RFC determination can include consideration of statements by the claimant, medical sources, or other sources familiar with an individual's impairments and limitations. 20 C.F.R. § 404.1545(a)(3). An ALJ considers the nature and extent of one's mental limitations when assessing her ability to work on a regular and continuing basis, affording consideration to the fact that "limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work

pressures in a work setting, may reduce [her] ability to do past work and other work." 20 C.F.R. § 404.1545(c). A RFC assessment must consider physical, mental and other limitations or restrictions to determine the "function-by-function" effect of impairment on an individual's ability to work. Social Security Ruling (SSR) 96-8p, Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 61 F.R. 34474-01, 34475 (Jul. 2, 1996).

While the ALJ considered Stanley's obesity and the daily leg pain discussed during the administrative hearing, he reasonably determined that the record supported no severe physical impairment that would affect Stanley's ability to perform basic work activities. R. 345-46. He was not obliged to conduct a function-by-function analysis of Stanley's physical limitations because the record did not support that they would affect her ability to work. Kiklis v. Astrue, No. 10-10699-NMG, 2011 WL 4768491, at *10 (D. Mass. Sept. 28, 2011) (citing Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005)).

The ALJ's assessment of Stanley's mental impairments complied with the requirements of SSR 96-8p. The ALJ found that Stanley had the severe impairments of "depression, anxiety and borderline intellectual functioning" and that "[t]he resulting restrictions on her ability to concentrate due to these conditions significantly impair her ability to do basic work activities." R. 338. However, her determined that Stanley would experience no more than mild limitations in activities of daily living, R. 343-344, moderate difficulties in maintaining social functioning, R. 343, and moderate difficulties in maintaining concentration, persistence or pace, R. 343. He considered the effect of Stanley's borderline intellectual functioning on her ability to sustain focus and the resulting limitation that she carry out only simple work tasks. R. 344. He determined that she would be able to interact appropriately with co-workers and supervisors,

communicating and conversing appropriately.  R. 344.  These conclusions reflect the ALJ's consideration of the entire record and are supported by substantial evidence previously discussed.  Because the ALJ's findings are conclusive when supported by substantial evidence, there is no error.  Ortiz, 955 F.2d at 769.

While the ALJ noted that Stanley experienced no "significant side effects" from her medications, R. 343-44, he did specifically acknowledge in his RFC assessment the weight gain Stanley experienced from her medication and its effect on Stanley's confidence.  R. 347.  To the extent that Stanley argues that her trip to California had a negative effect on the ALJ's credibility analysis, in turn effecting his RFC analysis, the ALJ made clear that his conclusions about Stanley's statements regarding her ability to work were discounted because they conflicted with the "medical evidence and her contemporaneous statements to treating sources."  Id.  Finally, to the extent that Stanley argues that the ALJ ignored the severity of her condition as indicated through her GAF scores, D. 16 at 12-13, an individual's "GAF score does not necessarily dictate the type of work that they are able to do."  Kiklis, 2011 WL 4768491, at *7 (citing Robert v. Astrue, 688 F. Supp. 2d 29, 39 (D. Mass. 2010) (noting that a GAF score of 50 does not indicate that an individual is unable to meet the basic mental demands necessary to engage in unskilled work)).

## V.     Conclusion

Based on the foregoing, the Commissioner's motion to affirm is GRANTED and Stanley's motion to reverse is DENIED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge